<u>**Proposed Objection Deadline:**</u> October 22, 2021 at 5:00 p.m. (prevailing Atlantic Time)
<u>**Proposed Hearing Date:**</u> beginning November 8, 2021 at 9:30 a.m. (prevailing Atlantic Time)

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY | PROMESA Title VI<br><br>Case No.  [  ] |

## APPLICATION OF THE
## PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY, BY AND THROUGH THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS ADMINISTRATIVE SUPERVISOR, FOR APPROVAL OF QUALIFYING MODIFICATION FOR PRIFA PURSUANT TO SECTION 601(M)(1)(D) OF THE PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as Administrative Supervisor pursuant to Section 601(1)(1) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"),[1] hereby files this Application (the "Application") for approval of the Qualifying Modification for the Puerto Rico Infrastructure Financing Authority ("PRIFA"), as Issuer, a copy of which is attached hereto as **Exhibit A** (the "Qualifying Modification"),[2] pursuant to Section 601(m)(1)(D) of PROMESA. In support of the Application, the Oversight Board states as follows:

### PRELIMINARY STATEMENT

1.       The proposed Qualifying Modification represents an important step in the Commonwealth of Puerto Rico's (the "Commonwealth") overall financial restructuring. Following extensive negotiations, the Oversight Board entered into that certain PRIFA Related

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in PROMESA, 48 U.S.C. § 2101 *et seq.*

[2] PRIFA and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), together with the Oversight Board as Administrative Supervisor, are co-proponents of the Qualifying Modification.

Plan Support Agreement, dated as of July 27, 2021 (the "PRIFA PSA"), with certain holders ("PRIFA Holders") and insurers of bonds issued by PRIFA (the "PRIFA Bonds") under the Trust Agreement, dated as of October 1, 1998, between PRIFA and Citibank, N.A. (as amended, the "Trust Agreement"). *See* Declaration of Brian S. Rosen, Esq. (the "Rosen Decl."), Ex. A. The insurers of PRIFA Bonds consist of Ambac Assurance Corp. ("Ambac"), Financial Guaranty Insurance Company ("FGIC"), Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "Assured," and together with Ambac and FGIC, the "Monolines"). The PRIFA PSA provides for, among other things, (i) terms for the resolution of certain litigation among the parties and the proposed restructuring of the PRIFA Bonds and claims against the Commonwealth and PRIFA arising from or related to the PRIFA Bonds; (ii) terms of certain securities to be issued pursuant to the plan of adjustment for the Commonwealth; and (iii) the agreement of the parties to support the terms of the plan of adjustment for the Commonwealth and the Qualifying Modification for PRIFA.

2.      In accordance with the PRIFA PSA, the Commonwealth filed the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "Title III Plan") and a corresponding disclosure statement in the Title III cases for the Commonwealth, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA"), both of which reflect the terms of the PRIFA PSA. *See* Case No. 17-BK-3283-LTS, ECF Nos. 17627 and 17628. The Title III Plan provides for, among other things, (i) the resolution of claims against the Commonwealth arising from and related to the PRIFA Bonds, including PRIFA Holders' asserted rights to receive certain excise tax revenues on rum produced in Puerto Rico and sold on the U.S. mainland, levied and collected by the Commonwealth, which were historically conditionally appropriated and

transferred to PRIFA, (ii) the payment of One Hundred Ninety-Three Million Five Hundred Thousand Dollars ($193,500,000.00), in cash, to PRIFA Holders and the Monolines, and (iii) the issuance of certain contingent value instruments ("CVIs") to be distributed to PRIFA Holders and the Monolines. Payments with respect to the CVIs are based on sharing the outperformance (if any) of (i) 5.5% of the Commonwealth's Sales and Use Taxes (the "Clawback CVI") and (ii) the Commonwealth's general fund rum tax collections (the "Rum Tax CVI").

3.      The Qualifying Modification complements the transactions contemplated in the Title III Plan. Specifically, under the Qualifying Modification, claims arising from the PRIFA Bonds will be resolved and the consideration under the Title III Plan will be released to the holders and insurers of PRIFA Bonds. The Qualifying Modification is limited to the modification of claims arising from the PRIFA Bonds, and does not affect any other debt of PRIFA.

4.      The Qualifying Modification has been endorsed by key stakeholders, which include the Monolines, who insure and hold the right to vote a majority of the $1,928,867,051.00 of claims against PRIFA arising from or relating to the PRIFA Bonds, and other parties that joined the PRIFA PSA. Moreover, proceeding under Title VI with the support of the Monolines and certain other PRIFA Holders avoids the delay, expense, and uncertainty associated with the commencement of a Title III case.

5.      Accordingly, pursuant to the *Motion for Entry of an Order Approving Procedures and Establishing Schedule for Approval of Qualifying Modification for the Puerto Rico Infrastructure Financing Authority* (the "Procedures Motion"), filed contemporaneously with this Application, the Oversight Board seeks to schedule the hearing to consider approval of the Qualifying Modification pursuant to PROMESA Section 601(m)(1)(D) (the "Approval Hearing")

to coincide with the hearing to consider confirmation of the Title III Plan, currently scheduled to begin on November 8, 2021.

6.      Pursuant to Title VI, the Court's review and approval of the Qualifying Modification is limited to determining whether "the requirements of [PROMESA Section 601] have been satisfied." *See* PROMESA § 601(m)(1)(D); 48 U.S.C. § 2231(m)(1)(D).  As discussed in this Application, Ambac and FGIC, as holders of the right to vote the majority of outstanding PRIFA Bonds, properly submitted the Qualifying Modification to the Oversight Board and obtained the requisite certifications under PROMESA Sections 601(g)(2) and 104(i)(1); the Oversight Board established, in consultation with PRIFA, a "Pool" of affected creditors in accordance with the requirements of PROMESA Section 601(d); and PRIFA complied with Title VI's information and notice requirements, and the Administrative Supervisor and PRIFA properly launched the solicitation of votes from creditors eligible to vote.  As such, the requirements of PROMESA Section 601 have clearly been met (or are anticipated to be satisfied following the voting deadline) and the Application should be approved.

7.      This Application has six parts: Part I provides relevant facts and history related to PRIFA; Part II summarizes the PRIFA PSA; Part III provides an overview of PROMESA Title VI; Part IV explains the Qualifying Modification; Part V describes the solicitation process; and Part VI explains how the requirements for approval of the Qualifying Modification pursuant to PROMESA Section 601 have been or will be satisfied.

## JURISDICTION

8.      The United States District Court for the District of Puerto Rico (the "<u>Court</u>") has subject matter jurisdiction over this matter pursuant to PROMESA Sections 106(a) and 601(m)(1)(D) and District of Puerto Rico Local Civil Rule 3.1.  48 U.S.C. §§ 2126(a),

2231(m)(1)(D).  The statutory predicate for the relief sought in this Application is PROMESA Section 601.  48 U.S.C. § 2231.

I.      **Background**

      A.      **PRIFA, the Oversight Board, and AAFAF**

**The Implementing Statutes**

      9.      PRIFA was created pursuant to Act 44, 3 L.P.R.A. § 1901–1923, on June 21, 1988 (as amended, the "PRIFA Enabling Act"), and is a public corporation and an instrumentality of the Commonwealth.  PRIFA historically provided financial, administrative, and other assistance to public corporations, instrumentalities, and municipalities of the Commonwealth that undertake the development of infrastructure of Puerto Rico.  Under the PRIFA Enabling Act, infrastructure includes capital works such as, among others, water supply systems and waste disposal systems. PRIFA was also established to provide alternate means to finance infrastructure projects.

      10.     To partly fund PRIFA's activities, the Commonwealth historically made appropriations to PRIFA from the general fund, on a conditional basis, of certain tax revenues remitted to the Commonwealth by the United States government.  The United States government imposes certain excise taxes on rum and other distilled spirits produced in Puerto Rico and sold on the United States mainland (the "Rum Taxes").  26 U.S.C. § 7652.  The Rum Taxes are collected by the United States Treasury and then "covered into" (i.e., deposited into) the "treasury of Puerto Rico" (and, once remitted to the Commonwealth, the "Rum Tax Remittances").  *Id.*

      11.     The PRIFA Enabling Act authorizes the Commonwealth to conditionally allocate to PRIFA up to the first $117 million of Rum Tax Remittances "covered into" the Puerto Rico Treasury each year, subject to the Commonwealth's retention powers.  3 L.P.R.A. § 1914. Historically, the Rum Tax Remittances "covered into" the Puerto Rico Treasury each year were deposited into the Treasury Single Account ("TSA"), which is the Commonwealth's main

operational account, and then transferred by the Commonwealth to PRIFA, subject to the Commonwealth's retention powers, and conditionally deposited into certain designated funds to be used by PRIFA for its corporate purposes pursuant to 3 L.P.R.A. § 1914. PRIFA is empowered to pledge the Rum Taxes, subject to § 8 of Article VI of the Constitution of the Commonwealth, as security for bonds. *See* 3 L.P.R.A. §§ 1906(m), 1907(a).

**The PRIFA Bonds**

12.     In 2005 and 2006, PRIFA issued the PRIFA Bonds in the amount of approximately $1.612 billion under the Trust Agreement. In accordance with 3 L.P.R.A. § 1914 and section 401 of the Trust Agreement, PRIFA established a segregated "sinking fund" held by the Trustee (the "Sinking Fund"). Section 601 of the Trust Agreement provides the principal, interest and premium, if any, on Bonds are to be paid solely from "Pledged Revenues." "Pledged Revenues" under the Trust Agreement consist of Rum Tax Remittances transferred to PRIFA by the Commonwealth and deposited into certain designated funds. *See* Trust Agreement § 101.

13.     In late 2015, the Commonwealth ceased depositing funds into the designated funds and, instead, retained the Rum Tax Remittances. As discussed below, prior to PROMESA, the retention of the Rum Tax Remittances was based on various Commonwealth emergency orders authorizing the retention of these funds. After the enactment of PROMESA, however, the continued retention of the Rum Tax Remittances was based on the terms of PROMESA and its preemption of inconsistent, pre-existing Commonwealth laws.

**The Emergency Orders**

14.     All obligations under the PRIFA Bonds were expressly made subject to the Commonwealth's powers in accordance with Article VI, Section 8 of the Commonwealth Constitution, to use the Rum Tax Remittances, as available resources, to pay General Obligation

bonds.  *See* 3 L.P.R.A. § 1914; Official Statement for the Series 2005 PRIFA Bonds at S–2; Official Statement for the Series 2006 PRIFA Bonds at S–3.  Pursuant to Section 8 of Article VI of the Commonwealth Constitution, on November 30, 2015, the then-Governor of the Commonwealth issued Administrative Bulletin OE-2015-046 (the "First Emergency Order"), which ordered the Secretary of the Treasury of the Commonwealth to withhold the Rum Tax Remittances.  *See* First Emergency Order at 2.  By January 2016, PRIFA could not satisfy its debt obligations and could no longer carry out its duties effectively.

15.    On April 6, 2016, PRIFA's fiscal agent responsibilities were transferred to the newly created AAFAF, under the *Puerto Rico Emergency Moratorium and Financial Rehabilitation Act*, Act No. 21-2016 (the "Moratorium Act").  *See* Moratorium Act § 602. AAFAF was granted the authority to "oversee all matters related to the restructuring or adjustment" of certain covered obligations, as designated by Puerto Rico's Governor.  Moratorium Act § 602(b).  Subsequently, then-Governor of the Commonwealth issued Administrative Bulletin OE-2016-014, which declared PRIFA to be in a state of emergency and Administrative Bulletin OE-2016-031, which designated PRIFA's bonds as "covered obligations."  *See* Administrative Bulletin OE-2016-014 at 2; Administrative Bulletin OE-2016-031 at 3.

16.    On January 18, 2017, the Puerto Rico legislature enacted the *Puerto Rico Fiscal Agency and Financial Advisory Authority Act*, Act 2-2017 (the "AAFAF Enabling Act"), which expanded AAFAF's authority and designated it as the only government entity authorized to renegotiate, restructure, and reach agreements with creditors in connection with public debt or any other debt issued by any government entity.  *See* AAFAF Enabling Act § 8(q).  AAFAF was also granted authority to compel any governmental entity to take action to comply with a fiscal

plan certified by the Oversight Board and to take action on behalf of any government entity to ensure compliance.  *See* AAFAF Enabling Act §§ 8(m) and (o).

**The Commonwealth Title III Case and Disputes Regarding the PRIFA Bonds**

17.     On June 30, 2016, PROMESA, codified at 48 U.S.C. § 2101, *et seq.*, was enacted and is dedicated towards developing a remedy to the ongoing fiscal and humanitarian crisis in Puerto Rico.  Titles I, II, IV, and V of PROMESA created the Oversight Board and provide for its powers, duties, and obligations.   Titles III and VI of PROMESA provide for debt restructurings, for Puerto Rico and its instrumentalities.

18.     On May 3, 2017 (the "CW Petition Date"), the Oversight Board filed a petition for relief under PROMESA Title III for the Commonwealth, commencing the Commonwealth's Title III case (the "Commonwealth Title III Case").

19.     Over the course of the Commonwealth Title III Case, the Oversight Board has represented the Commonwealth's interests in numerous adversary proceedings and contested matters, including disputes related to the PRIFA Bonds.  Pursuant to the PRIFA PSA, the parties have agreed to resolve the various adversary proceedings and contested matters related to the PRIFA Bonds.  An overview of some of the matters resolved by the PRIFA PSA follows below.

**PRIFA Lift Stay Motion**

20.     On May 30, 2019, Ambac filed a motion for (i) an order declaring that the automatic stay does not apply to its action against the United States Treasury for an equitable lien on pledged rum taxes before they are transferred to the Commonwealth and its action against the Commonwealth to enforce its lien on pledged rum taxes, or, in the alternative, (ii) relief from the automatic stay to pursue the actions, or, in the further alternative, (iii) adequate protection for its collateral.  Ambac alleges that the automatic stay does not apply because the Commonwealth does

not have a property interest in the pledged rum taxes. Ambac further alleged that the Commonwealth had violated PROMESA and Commonwealth law by diverting the pledged rum taxes (the "PRIFA Lift Stay Motion"). *See* Case No. 17-BK-3283-LTS, ECF No. 7176. On July 3, 2019, the Oversight Board and AAFAF filed oppositions to the PRIFA Lift Stay Motion. *See* Case No. 17-BK-3283-LTS, ECF Nos. 7827, 7829. The Oversight Board's opposition included the argument, among others, that Ambac lacks standing to institute the motion.

21. On September 9, 2020, the Title III Court issued an order denying the PRIFA Lift Stay Motion. *See* Case No. 17-BK-3283-LTS, ECF No. 14186. On March 3, 2021, the denial was affirmed by the United States Court of Appeals for the First Circuit. *See* Case No. 20-1931.

**PRIFA Revenue Bond Litigation**

22. On January 16, 2020, the Oversight Board, acting in its capacity as Title III representative of the Commonwealth, filed an action against Ambac, Assured Guaranty Corporation, FGIC, and U.S. Bank Trust National Association ("U.S. Bank," and collectively with Ambac, Assured Guaranty Corporation, and FGIC, the "PRIFA Defendants") challenging the proofs of claim filed against the Commonwealth and other lien claims asserted by the PRIFA Defendants as holders and/or insurers of PRIFA Bonds (the "PRIFA Revenue Bond Litigation"). *See Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corp., et al.*, Adv. Proc. No. 20-00003, ECF No. 1. The PRIFA Defendants filed proofs of claim (or alleged other claims of liens) in the Commonwealth Title III Case asserting, among other things, (i) the Commonwealth has liability for failing to appropriate and transfer the Rum Taxes, levied and collected by the Commonwealth, which were historically conditionally appropriated and transferred to PRIFA, (ii) violations of the Commonwealth and U.S. Constitutions, and (iii) various statutory and contractual theories to render their proofs of claim allowable.

23.     Therein, the Oversight Board contended the PRIFA Bonds are non-recourse obligations of PRIFA, and the Commonwealth has no liability with respect to the PRIFA Bonds as it is neither an issuer nor a guarantor of the PRIFA Bonds pursuant to the PRIFA Enabling Act and documents governing the PRIFA Bonds. The Oversight Board sought disallowance of all PRIFA Defendants' proofs of claim (or other claims of lien) related to the PRIFA Bonds as against the Commonwealth on the grounds that, among other things, (i) the PRIFA Defendants lack standing to assert a claim against the Commonwealth as to the PRIFA Bonds, (ii) the PRIFA Enabling Act and documents governing the PRIFA Bonds do not create statutory or equitable liens, (iii) the PRIFA Defendants do not have an ownership interest in any rum excise tax revenues, (iv) the PRIFA Defendants' purported security interests are limited to those funds received by PRIFA and deposited in specified deposit accounts held by the fiscal agent, (v) the PRIFA revenues are not special revenues as defined in Bankruptcy Code section 902(2), (vi) the PRIFA Defendants lack subrogation, reimbursement, or contribution rights, (vii) the retention of the rum excise tax revenues by the Commonwealth was permitted by Commonwealth law, the PRIFA Enabling Act and the documents governing the PRIFA Bonds, (viii) the Commonwealth's retention of the rum excise tax revenues is neither a breach of contract nor a tort against the Commonwealth, (ix) any purported Commonwealth obligation to appropriate and transfer funds to PRIFA was preempted by PROMESA, (x) the PRIFA Defendants do not have an allowable claim under the Contract, Due Process, and Takings Clauses of the Commonwealth and U.S. Constitutions, (xi) the PRIFA Defendants do not have an allowable claim under PROMESA Section 407, and (xii) the PRIFA Defendants do not have a secured claim, a priority claim, a perfected security interests, or a claim for postpetition revenues.

24.     On April 28, 2020, the Oversight Board filed a motion for partial summary judgment.  *See* Adv. Proc. No. 20-00003, ECF No. 43.  On July 16, 2020, the PRIFA Defendants filed a response to the Oversight Board's motion and a declaration of John Hughes, which sought discovery prior to a ruling on the motion, pursuant to Fed. R. Civ. P. 56(d).  *See* Adv. Proc. No. 20-00003, ECF Nos. 80, 82.  On January 20, 2021, the Title III Court issued an order authorizing discovery regarding certain of the topics addressed in the declaration submitted by the PRIFA Defendants.  At the time, the PRIFA PSA was executed, the PRIFA Defendants were conducting supplemental discovery.

25.     Pursuant to the PRIFA PSA, on August 2, 2021, the Monolines, U.S. Bank, and the Oversight Board filed a joint motion to stay certain matters relating to PRIFA Bonds, including the PRIFA Lift Stay Motion and the PRIFA Revenue Bond Litigation.  *See* Case No. 17-BK-3283-LTS, ECF No. 17641.

## II.     The PRIFA Plan Support Agreement

26.     On July 27, 2021, the Oversight Board, as representative of the Commonwealth, following extensive discussions guided by the court-appointed Mediation Team, entered into the PRIFA PSA with PRIFA Holders, Ambac, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to PRIFA Bonds, and FGIC, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to PRIFA Bonds.  The PRIFA PSA, among other things, resolves asserted rights arising from the Commonwealth's retention of Rum Taxes, levied and collected by the Commonwealth.  Pursuant to the PRIFA PSA, in exchange for the settlement of these asserted rights, the Oversight Board agreed to propose and seek confirmation of the Title III Plan pursuant to which the Commonwealth will provide PRIFA Holders and the Monolines with consideration in the form of the PRIFA Clawback CVI and their

Pro Rata Share of One Hundred Ninety-Three Million Five Hundred Thousand Dollars ($193,500,000.00), in cash.

27.     On July 30, 2021, in accordance with the PRIFA PSA, the Oversight Board filed the Title III Plan and a corresponding disclosure statement in the Title III cases for the Commonwealth, ERS, and PBA, both of which reflect the terms of the PRIFA PSA. The hearing to consider confirmation of the Title III Plan is scheduled to begin on November 8, 2021.

28.     Pursuant to the PRIFA PSA and Section 601(i) of PROMESA, Ambac and FGIC delivered to the Oversight Board a letter, dated August 13, 2021, proposing the Qualifying Modification to modify approximately $1,928,867,051.00 in Bond Claims (as defined below). *See* Rosen Decl., Ex. B. The Bond Claims subject to the Qualifying Modification (*i.e.*, the Participating Bond Claims) include claims based on the PRIFA Bonds.

29.     On August 27, 2021, the Oversight Board, as Administrative Supervisor, authorized PRIFA, pursuant to Section 601(e) of PROMESA, to be eligible to avail itself of the procedures under Section 601 of PROMESA and certified the transactions contemplated by the PRIFA PSA to be executed under the Title III Plan as a Qualifying Modification pursuant to Section 601(g)(2)(A) of PROMESA. *See* Rosen Decl., Ex. C.

## III.     Overview of PROMESA Title VI

30.     PROMESA provides two mechanisms for the Commonwealth and its instrumentalities to modify or restructure their debts: (i) Title III, which creates a court-supervised process similar to a proceeding under chapter 9 of the Bankruptcy Code, and (ii) Title VI, which provides an out-of-court process for negotiating a consensual debt modification with significant, but less than unanimous, support from affected creditors, with final court approval to bind non-consenting creditors. *See* PROMESA §§ 301–317, 601; 48 U.S.C. §§ 2161–2177, 2231.

12

31.     More specifically, Title VI's collective creditor action provisions permit certain designated instrumentalities of the Commonwealth to effectuate a "Modification" of their funded debt and other financial indebtedness (collectively, "Bonds") with the consent of a supermajority of those creditors voting in any affected class (each, a "Pool"), provided that such supermajority of those voting also constitutes a majority of the Bonds outstanding in such Pool. PROMESA § 601(j); 48 U.S.C. § 2231(j).   If the dual-pronged voting threshold is satisfied, the debt Modification's terms bind all holders of claims within the same Pool.

32.     PROMESA uses a broad definition of "Bonds" to determine eligibility for Modification under Title VI, encompassing not just financial instruments issued pursuant to a credit agreement or indenture, but many other types of financial obligations:

> bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness for borrowed money, including rights, entitlements, or obligations whether such rights, entitlements, or obligations arise from contract, statute, or any other source of law, in any case, related to such a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness in physical or dematerialized form of which the issuer, obligor, or guarantor is the territorial government.

PROMESA § 5(2); 48 U.S.C. § 2104(2).  In turn, PROMESA Section 5(3) defines "Bond Claims" to mean, as it relates to a Bond, the:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

PROMESA § 5(3); 48 U.S.C. § 2104(3).  Any claim that is a "Bond Claim" can be modified under Title VI.

33.     A "Modification" that can be effectuated pursuant to Title VI includes "any modification, amendment, supplement, or waiver affecting any one or more series of Bonds, including those effected by way of exchange, conversion, or substitution." *See* PROMESA § 601(a)(9); 48 U.S.C. § 2231(a)(9). Modifications can be proposed by the "Issuer" or by one or more holders of the right to vote the Issuer's outstanding Bonds. The Issuer means either the Commonwealth or an "Authorized Territorial Instrumentality" that has "issued or guaranteed at least one Bond that is Outstanding." *See* PROMESA § 601(a)(8); 48 U.S.C. § 2231(8). An "Authorized Territorial Instrumentality" is an entity specifically authorized by the Oversight Board to avail itself of Title VI. *See* PROMESA § 601(e); 48 U.S.C. § 2231(e).

## IV.     Overview of the Qualifying Modification

34.     As set forth in the PRIFA PSA, PRIFA's creditors agreed to a modification of PRIFA Bonds, consisting of a complete discharge of such bonds, pursuant to the Qualifying Modification and, in certain respects, the Title III Plan. The Title III Plan and the Qualifying Modification set forth the terms and conditions for a global compromise and integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights of holders of Bond Claims, including the dispute raised by certain holders of Bond Claims asserting rights to receive revenues historically conditionally appropriated and transferred to PRIFA.

35.     Upon the consummation of the Qualifying Modification (the "PRIFA Effective Date"), and satisfaction of the PRIFA Distribution Conditions (as defined in the Qualifying Modification), each holder of a Participating Bond Claim shall be entitled to receive in full consideration, satisfaction, release and exchange of such holder's Participating Bond Claim, a Pro Rata Share of One Hundred Ninety-Three Million Five Hundred Thousand Dollars ($193,500,000.00), in cash, and the PRIFA Clawback CVIs.

36.     In exchange for executing the PRIFA PSA, agreeing to all of its terms and conditions, and structuring the payments to be made to be made in accordance with the Settlement Summary annexed thereto as Exhibit F, subject to the entry of an order of the Title III Court confirming the Title III Plan and an order approving the Qualifying Modification, Ambac and FGIC are entitled to receive structuring fees in the amounts of Thirty-Four Million Seven Hundred Fifty Thousand Dollars ($34,750,000.00) and Twenty-One Million Seven Hundred Fifty Thousand Dollars ($21,750,000.00), respectively.

37.     In exchange for executing the PRIFA PSA, and agreeing to all of its terms and conditions, including the agreement to "lock-up" their bonds in accordance with the terms of the PRIFA PSA, subject to the entry of an order of the Title III Court confirming the Title III Plan and an order approving the Qualifying Modification, the PSA Restriction Fee Creditors (as defined in the PRIFA PSA) are entitled to receive the a restriction fee, as set forth in Section 3.2 of the Qualifying Modification and Section 6.1 of the PRIFA PSA, in an aggregate amount not to exceed Ten Million Dollars ($10,000,000.00).

38.     The occurrence of the PRIFA Effective Date is subject to, among other things, the entry of an order of the Title III Court confirming the Title III Plan and the order approving the Qualifying Modification.

## V.     Solicitation Process

39.     Both holders of Participating Bond Claims, and the Monolines as holders of the right to vote the Participating Bond Claims, will have adequate time to consider the materials in the Solicitation Package and to make an informed decision to accept or reject the Qualifying Modification. As an initial matter, a substantial number of PRIFA's creditors are party to the PRIFA PSA. The Monolines insure and hold the right to vote fifty-three percent (53%) of the PRIFA Bonds and are a party to the PRIFA PSA and PRIFA Holders holding an additional

twenty-four percent (24%) of the PRIFA Bonds have also joined the PRIFA PSA pursuant to Joinder Agreements. Through their participation in the PRIFA PSA, these parties have had ample time to review extensively the terms of the Qualifying Modification as outlined in the PRIFA PSA, whether directly, or through their professional advisors. As such, and pursuant to the PRIFA PSA and Joinder Agreements thereto, the Oversight Board anticipates that no less than seventy-seven percent (77%) of holders or insurers of PRIFA Bonds will accept the Qualifying Modification.

40.     On October 5, 2021, PRIFA began soliciting votes to accept the Qualifying Modification and elections with respect to distributions pursuant to the Qualifying Modification by transmitting copies of a solicitation package containing (i) the Solicitation Statement, which includes as an exhibit the Qualifying Modification, *see* Rosen Decl., Ex. D; and (ii) a ballot, if applicable (the "Ballot") (collectively, the "Solicitation Package"). The Solicitation Package was distributed to all holders of Participating Bond Claims and the Monolines as holders of the right to vote insured Participating Bond Claims as of October 5, 2021 (the "Voting Record Date") via electronic mail to representatives such as DTC participants or their mailing agents (collectively, the "Nominees") on behalf of beneficial owners of certain Participating Bond Claims.

41.     In addition, beneficial holders of insured Participating Bond Claims were provided with a notice of election (the "Election Notice") related to the election and treatment of their claims by Ambac, FGIC, or Assured, as applicable. The beneficial holders of Ambac insured Participating Bond Claims are entitled to choose between two treatment options, the Ambac Commutation Treatment, as described in Section 6.1(a) of the Qualifying Modification, or the Ambac Non-Commutation Treatment, as described in Section 6.1(b) of the Qualifying Modification. If the Qualifying Modification is approved, the beneficial holders of FGIC insured

Participating Bond Claims will receive their Pro Rata Share of beneficial interests in the FGIC Trust (as defined in the Qualifying Modification). If the Qualifying Modification is approved, the beneficial holders of Assured insured Participating Bond Claims will receive the Assured Acceleration Price (as defined in the Qualifying Modification).

42.     The Solicitation Package advises recipients, among other things, that the deadline for submitting a Ballot containing a vote to accept or reject the Qualifying Modification or an election with respect to distributions pursuant to the Qualifying Modification is November 3, 2021 at 11:59 p.m. (prevailing Eastern Time)] (the "Voting Deadline"). The Solicitation Package further advises recipients that Ballots must be returned to Prime Clerk, LLC (the "Calculation Agent"). The Election Notices advise beneficial holders of insured Participating Bond Claims of the treatment selected by Ambac, FGIC, or Assured, as applicable. The Ballot and Election Notice, as applicable, contain detailed instructions on how to complete it and how to make any applicable elections contained therein.

43.     Moreover, the materials in the Solicitation Package establish and communicate how the Calculation Agent will tabulate the votes and elections contained in the Ballot. Those rules provide, among other things, that: (i) Ballots received on or after the Voting Deadline (provided that the Voting Deadline has not been extended) will not be counted, unless the Calculation Agent otherwise determines; (ii) a timely, properly completed Ballot submitted by a holder of a Participating Bond Claim supersedes and revokes any prior Ballot(s) submitted by that holder; (iii) Ballots that attempt to partially accept and partially reject the Qualifying Modification, or that do not indicate an approval or a rejection of the Qualifying Modification, or that indicate both approval and rejection of the Qualifying Modification will not be counted; and (iv) illegible Ballots

or Ballots containing insufficient information to identify the holder of a Participating Bond Claim or is unsigned will not be counted.

44.     The Solicitation Statement, including the Qualifying Modification, were also filed on the Electronic Municipal Market Access system ("EMMA") on October 6, 2021.

## VI.     The Qualifying Modification Satisfies (or Will Satisfy) Each Requirement for Approval Under PROMESA Section 601

45.     PROMESA Section 601(m)(1)(D) provides that, in order for a Qualifying Modification to be binding and effective, this Court must determine that "the requirements of [PROMESA Section 601] have been satisfied." *See* PROMESA § 601(m)(1)(D); 48 U.S.C. § 2231(m)(1)(D). As demonstrated below, the Qualifying Modification clearly complies (or will comply) with each applicable requirement of Section 601, including among other things, Title VI's requirements for (i) vote pooling and claim classification, *id*. § 601(d); (ii) vote solicitation, *id.* § 601(h), which pursuant to the PRIFA PSA and Joinder Agreements thereto, the Administrative Supervisor expects no less than seventy-seven percent (77%) of Bond Claims to accept the Qualifying Modification; and (iii) vote tabulation, *id*. § 601 (b), (j).

### A.     The Qualifying Modification Complies with PROMESA's Pooling Requirements (PROMESA § 601(d))

46.     The pooling of claims under the Qualifying Modification is proper in accordance with PROMESA. For purposes of voting on a Qualifying Modification, PROMESA Section 601(d) directs the Oversight Board, as the Administrative Supervisor, to establish, in consultation with the Issuer (here, PRIFA), separate Pools of Bonds distinguished by specific provisions governing priority or security arrangements.

47.     Specifically, Section 601(d) sets forth the requirements for classifying Bonds in separate Pools, and provides as follows:

- Not less than one Pool shall be established for each Issuer. PROMESA § 601(d)(1); 48 U.S.C. § 2231(d)(1).

- "Secured Pools"[3] shall be established for claims secured by a lien on property. PROMESA § 601(d)(2); 48 U.S.C. § 2231(d)(2).

- For each Issuer with multiple Bonds that are distinguished by specific provisions governing priority or security arrangement, separate Pools shall be established corresponding to the relative priority or security arrangements of each holder. PROMESA § 601(d)(3)(A); 48 U.S.C. § 2231(d)(3)(A).

- For each Issuer that has issued senior and subordinated Bonds, separate Pools shall be established for the senior and subordinated Bonds corresponding to the relative priority or security arrangements. PROMESA § 601(d)(3)(B); 48 U.S.C. § 2231(d)(3)(B).

- For each Issuer that has issued multiple Bonds, for at least some of which a guarantee of repayment has been provided by the Commonwealth, separate Pools shall be established for such guaranteed and non-guaranteed Bonds. PROMESA § 601(d)(3)(C); 48 U.S.C. § 2231(d)(3)(C).

- For each Issuer that has issued multiple Bonds, for at least some of which a dedicated revenue stream has been pledged for repayment, separate Pools shall be established as follows: (i) for each dedicated revenue stream that been pledged for repayment, not less than one Secured Pool for Bonds for which such revenue stream has been pledged, and separate Secured Pools shall be established for Bonds of different priority; and (ii) not less than one Pool for all other Bonds issued by the Issuer for which a dedicated revenue stream has not been pledged for repayment. PROMESA § 601(d)(3)(D); 48 U.S.C. § 2231(d)(3)(D).

48.     PROMESA also prohibits placing Bonds that have identical rights in security or priority into separate Pools. *See* PROMESA § 601(d)(3)(E); 48 U.S.C. § 2231(d)(3)(E).

49.     In accordance with the foregoing requirements, the Qualifying Modification contains one Pool (the "PRIFA Bond Claims Pool"), which includes the claims against PRIFA

---

[3] The term "Secured Pool" means a "Pool established in accordance with subsection (d) consisting only of Bonds that are secured by a lien on property, provided that the inclusion of a Bond Claim in such Pool shall not in any way limit or prejudice the right of the Issuer, the Administrative Supervisor, or any creditor to recharacterize or challenge such Bond Claim, or any purported lien securing such Bond Claim, in any other manner in any subsequent proceeding in the event a proposed Qualifying Modification is not consummated." PROMESA § 601(a)(14); 48 U.S.C. § 2231(a)(14).

arising from or relating to the PRIFA Bonds. All of the Bond Claims in the PRIFA Bond Claims Pool possess the same priority and other legal rights.

50.     On September 24, 2021, the Oversight Board issued a resolution certifying the PRIFA Bonds Claims Pool as the only Pool pursuant to Section 601(d). *See* Rosen Decl., Ex. E. Accordingly, the Oversight Board submits that the Pool, as certified by the Oversight Board, complies with PROMESA Section 601(d).

### B.     PRIFA is an Authorized Territorial Instrumentality (PROMESA § 601(e))

51.     Pursuant to PROMESA Section 601(e), a territorial instrumentality, such as PRIFA, is eligible to restructure its indebtedness under Title VI if the Oversight Board has authorized such territorial instrumentality to avail itself of Title VI, thus making it an "Authorized Territorial Instrumentality" under PROMESA. On August 27, 2021, the Oversight Board issued a resolution designating PRIFA as an Authorized Territorial Instrumentality under Section 601(e). *See* Rosen Decl., Ex. C.

### C.     The Information Delivery Requirement Was Satisfied (PROMESA § 601(f))

52.     Prior to solicitation of votes on a Qualifying Modification, PROMESA Section 601(f) requires the Issuer to provide the Oversight Board, the Calculation Agent, and Prime Clerk, LLC in its capacity as information agent (the "Information Agent") with the following information (collectively, the "Information Delivery Requirement"):

- a description of (i) the Issuer's economic and financial circumstances, (ii) existing debts, and (iii) the impact of the proposed Qualifying Modification on the territory's or its territorial instrumentalities' public debt;

- a description of any other modifications being sought by the Issuer affecting any other Pools;

- if a fiscal plan with respect to such Issuer has been certified, the applicable fiscal plan; and

- such other information as may be required under applicable securities laws.

53.     On September 27, 2021, PRIFA and AAFAF provided a substantially complete version of the Solicitation Package to the Oversight Board, the Information Agent, and the Calculation Agent, and provided those entities with an opportunity to review and comment on such materials.  On September 28, 2021, the Oversight Board acknowledged receipt of the Solicitation Package.  *See* Rosen Decl., Ex. F.  Subsequently, and prior to the distribution of the Solicitation Package, additional information was provided by PRIFA, AAFAF, and the Monolines and included in the Solicitation Package.  The Solicitation Package includes all of the foregoing information, thus satisfying the Information Delivery Requirement.

### D.     The Transactions Contemplated by the PRIFA PSA were Certified by the Oversight Board as a Qualifying Modification (PROMESA § 601(g))

54.     In order to proceed with a Title VI Modification, the Oversight Board must certify that the Modification is a Qualifying Modification in accordance with PROMESA Section 601(g). A Modification constitutes a Qualifying Modification if the Modification satisfies the requirements of either (i) the "voluntary agreement process," as set forth in Section 601(g)(2)(A)–(B) (the "Voluntary Agreement Process"), or (ii) the "consultation process," as set forth in Section 601(g)(1)(A)–(C).  48 U.S.C. §§ 2231(g)(2)(A)–(B), 2231(g)(1)(A)–(C).

55.     The Oversight Board has certified the transactions contemplated by the PRIFA PSA as a Qualifying Modification pursuant to the Voluntary Agreement Process.  *See* Rosen Decl., Ex. C.  In certifying the transactions contemplated by the PRIFA PSA as a Qualifying Modification, the Oversight Board determined that (i) the transactions contemplated by the PRIFA PSA constituted a voluntary agreement (a "Voluntary Agreement") that provides for a sustainable level of debt, in accordance with PROMESA Section 104(i)(1)(B), (ii) such Voluntary Agreement was effective because a majority in amount of the Bond Claims that are to be affected by the Qualifying Modification entered into the PRIFA PSA, in accordance with PROMESA Section 104(i)(2)(B),

and (iii) the Qualifying Modification satisfied PROMESA's requirement that each holder in the same Pool receive the same consideration, as required by Section 601(g)(1)(B).[4]

### E.  The Qualifying Modification Was Properly Solicited (PROMESA § 601(h))

56.  In order to solicit votes on the Qualifying Modification, the Information Agent must submit to the holders of any "Outstanding Bonds" of the Issuer, a package of solicitation materials, which must include the materials required to satisfy the Information Delivery Requirement. PROMESA § 601(h)(1); 48 U.S.C. § 2231(h)(1).

57.  PROMESA Section 601(b) defines what qualifies as an "Outstanding Bond" for purposes of soliciting votes on a Qualifying Modification.  A Bond will be deemed *not* to be outstanding, and may *not* be counted in a vote on the Qualifying Modification, if as of the Voting Record Date:

- the Bond has previously been cancelled or delivered for cancellation or is held for reissuance but has not been reissued;

- the Bond has previously been called for redemption or previously become due and payable at maturity and the Issuer has previously satisfied its obligation to make, or provide for, all payments due in respect of the Bond;

- the Bond has been substituted with a security of another series; or

- the Bond is held by the Issuer or by an Authorized Territorial Instrumentality of the Territory Government Issuer or by a corporation, trust, or other legal entity that is controlled by the Issuer or an Authorized Territorial Instrumentality, as applicable.

PROMESA § 601(b)(1)–(4); 48 U.S.C. § 2231(b)(1)–(4).

---

[4] PROMESA Section 601(g)(1)(B) requires that "each exchanging, repurchasing, converting, or substituting holder of Bonds of any series in a Pool affected by that Modification is offered the same amount of consideration per amount of principal, the same amount of consideration per amount of interest accrued but unpaid and the same amount of consideration per amount of past due interest, respectively, as that offered to each other exchanging, repurchasing, converting, or substituting holder of Bonds of any series in a Pool affected by that Modification . . . ." Here, the Qualifying Modification includes one Pool, with all parties in the Pool receiving compensation in the same manner and, thus, this requirement is satisfied.

58.     PROMESA Section 601(c) requires that, prior to soliciting votes on a Qualifying Modification, the Issuer must deliver to the Calculation Agent a certificate, signed by an authorized representative of the Issuer, specifying any Bonds that are deemed *not* to be Outstanding Bonds for purposes of soliciting votes on the Qualifying Modification.  *See* PROMESA § 601(c), 48 U.S.C. § 2231(c).  On October 4, 2021, AAFAF on behalf of PRIFA delivered a certificate, signed by Julian Bayne Hernández, Deputy Executive Director of AAFAF, informing the Calculation Agent that there are no PRIFA Participating Bonds (as defined in the Solicitation Statement) that are not deemed an Outstanding Bond for the purpose of PROMESA Section 601(b).  *See* Rosen Decl., Ex. G.

59.     In addition, PROMESA sets forth certain guidelines regarding the manner of solicitation if the Information Agent is unable to identify an address for an Eligible Voter (as defined below).  Specifically, if the address of an Eligible Voter is unavailable, Section 601(h)(2) authorizes the Information Agent to solicit the vote or consent of such holders by:

- delivering the solicitation to the paying agent or The Depository Trust Corporation (if it serves as the clearing system for any of the Issuer's Outstanding Bonds); or

- delivering or publishing the solicitation by whatever means the Information Agent, after consultation with the Issuer, "deems necessary and appropriate in order to make a reasonable effort to inform holders of any Outstanding Bonds of the Issuer."

*See* PROMESA § 601(h)(2); 48 U.S.C. § 2231(h)(2).  Section 601(h)(2)(B) confirms that "necessary and appropriate" notice may include notice by mail, publication in electronic media, publication on a website of the Issuer, or publication in newspapers of national circulation in the United States.  *See* PROMESA § 601(h)(2)(B); 48 U.S.C. § 2231(h)(2)(B).

60.     PRIFA implemented a process for their solicitation that the Oversight Board, as Administrative Supervisor, believes comports with PROMESA Section 601(h).  Because the

solicitation of votes and elections of Participating Bond Claims eligible to vote and/or make elections (each, an "Eligible Voter") is being conducted through the Automated Tender Offer Program ("ATOP") at The Depository Trust Company ("DTC"), only current holders of the PRIFA Bonds can render them for voting or election purposes on or before the Voting Deadline.[5]

61.    On October 5, 2021, PRIFA commenced the solicitation of votes by causing the Information Agent to distribute the Solicitation Packages to each Eligible Voter, including Nominees. The Solicitation Packages included the Solicitation Statement, which included as an exhibit the Qualifying Modification, and an applicable Ballot. The holders of Participating Bond Claims, as holders of the right to vote Participating Bond Claims, were directed in the Solicitation Statement and Ballots to follow the instructions contained in the Ballots in completing and submitting their respective Ballots through ATOP. The Monolines, as holders of the right to vote Participating Bond Claims, were directed in the Solicitation Statement and Ballots to follow the instructions contained in the Ballots in completing and submitting their respective Ballots directly to the Information Agent. The holders of Participating Bond Claims and the Monolines, as holders of the right to vote Participating Bond Claims, were also informed in the Solicitation Statement and Ballots that they must submit a completed Ballot through ATOP or directly to the Information Agent, as applicable, by 11:59 p.m. (prevailing Eastern Time) on November 3, 2021, the Voting Deadline, in order to be counted. In the case of Participating Bond Claims held through a Nominee, the holder must instruct its Nominee of such holder's vote or election in accordance with the instructions provided by the Nominee.

62.    The holders of FGIC insured Participating Bond Claims, Assured insured Participating Bond Claims, or Ambac insured Participating Bond claims that wish to receive the

---

[5] The Monolines were provided paper ballots to vote their Participating Bond Claims.

Ambac Commutation Treatment, as described in Section 6.1(a) of the Qualifying Modification, were informed in the applicable Election Notice that they are not required to take any action to receive the applicable treatment of their claims. The holders of Ambac insured Participating Bond Claims were informed in the applicable Election Notices that if they wish to elect to receive the Ambac Non-Commutation Treatment, as described in Section 6.1(b) of the Qualifying Modification that they must instruct their broker or nominee to electronically deliver their Ambac insured PRIFA Bonds through ATOP by 11:59 p.m. (prevailing Eastern Time) on November 3, 2021, the Voting Deadline.

63.     PRIFA also published the Solicitation Statement, including the Qualifying Modification on EMMA on October 6, 2021.

64.     Accordingly, parties in interest were afforded sufficient notice of voting on the Qualifying Modification and elections with respect to distributions pursuant to the Qualifying Modification. PRIFA has fully complied with the requirements of Section 601(h).

F.     **Ambac and FGIC are Eligible to Propose the Qualifying Modification (PROMESA § 601(i))**

65.     Pursuant to PROMESA Section 601(i), a Modification can be proposed by the Issuer or by one or more holders of the right to vote the Issuer's outstanding Bonds. Ambac and FGIC are holders of the right to vote PRIFA's Outstanding Bonds, and thus are eligible to propose the Qualifying Modification in accordance with Section 601(i).

G.     **The Voting Requirements Will be Satisfied Prior to the Approval Hearing (PROMESA § 601(j))**

66.     In order for a Qualifying Modification to be approved, PROMESA Section 601(j) requires that the Qualifying Modification satisfy both a majority vote requirement and the supermajority vote requirement (collectively, the "Requisite Approvals"):

- *The Majority Vote Requirement*. Eligible Voters holding over 50% of the "Outstanding Principal" amount of Outstanding Bonds in each Pool must vote to approve the Qualifying Modification.

- *The Supermajority Vote Requirement*.  Eligible Voters holding over 66 2/3% of the "Outstanding Principal" amount of Outstanding Bonds in each Pool that have voted in this solicitation to approve or reject the Qualifying Modification must vote to approve the Qualifying Modification.

67.     The Monolines  insure and hold  the right to vote fifty-three percent (53%) of the PRIFA Bonds and are a party to the PRIFA PSA and PRIFA Holders holding an additional twenty-four percent (24%) of the PRIFA Bonds have joined the PRIFA PSA pursuant to Joinder Agreements and are thus bound to vote in favor of the Qualifying Modification. Accordingly, the Oversight Board is confident that the Requisite Approvals will be obtained.  After the Voting Deadline and before the Approval Hearing, the Oversight Board will file a certification from the Calculation Agent setting forth the voting results.

### H.     Prime Clerk, LLC has been Properly Designated the Calculation Agent and Information Agent (PROMESA §§ 601(k), (l))

68.     For the purposes of (i) administering a vote of holders of Bond Claims; and (ii) calculating the principal amount of the Bond Claims of any series eligible to participate in such a vote and tabulating such votes, PROMESA Sections 601(k) and 601(l) provide that a Calculation Agent and an Information Agent may be appointed, who must be reasonably acceptable to the Oversight Board. On September 24, 2021, the Oversight Board issued a resolution certifying that Prime Clerk, LLC is reasonably acceptable to serve as the Information Agent and the Calculation Agent for the solicitation.  *See* Rosen Decl., Ex. E.  Accordingly, the requirements of Sections 601(k) and 601(l) have been satisfied.

I.   **Prior to the Approval Hearing, the Oversight Board Anticipates that PROMESA Section 601(m) will be Satisfied**

69.   In order for a Qualifying Modification to become conclusive and binding on all holders of Participating Bond Claims, the requirements set forth in PROMESA Section 601(m), and below must be satisfied:

- The Requisite Approvals have been obtained.  *See* PROMESA § 601(m)(1)(A); 48 U.S.C. § 2231(m)(1)(A).

- The Oversight Board, as Administrative Supervisor, certifies that (i) the Requisite Approvals have been obtained; (ii) the Qualifying Modification complies with the requirements set forth in PROMESA Section 104(i)(1); and (iii) any conditions on the effectiveness of the Qualifying Modification have been satisfied or, in the Oversight Board's sole discretion, satisfaction of such conditions has been waived (except for such conditions that have been identified in the Qualifying Modification as non-waivable) (the "601(m) Certification").  *See* PROMESA § 601(m)(1)(B); 48 U.S.C. § 2231(m)(1)(B).

- With respect to a Bond Claim that is secured by a lien on property and with respect to which the holder of such Bond Claim has rejected or not consented to the Qualifying Modification, the holder of such Bond (i) retains the lien securing such Bond Claims or (ii) receives on account of such Bond Claim through deferred cash payments, substitute collateral or otherwise at least the equivalent value of the lesser of the amount of the Bond Claim or of the collateral securing such Bond Claim.  *See* PROMESA § 601(m)(1)(C); 48 U.S.C. § 2231(m)(1)(C).

- The District Court has entered an order approving the Qualifying Modification as satisfying the requirements of PROMESA Section 601.  *See* PROMESA § 601(m)(1)(D); 48 U.S.C. § 2231(m)(1)(D).

70.   Following solicitation of the Qualifying Modification and obtaining the Requisite Approvals, the Oversight Board will provide the Section 601(m) Certification.  In addition, no Bond Claims are secured by a lien on property and, thus, such provision of Section 601(m)(1)(C) will not be implicated by the Qualifying Modification.

71.   Accordingly, prior to the Approval Hearing, the Oversight Board anticipates that all requirements of Section 601(m), other than Court approval, will have been satisfied.

## RESERVATION OF RIGHTS

72.     Nothing contained in this Application is an admission of the validity of any claim against PRIFA, or a waiver of the Oversight Board's, or any other party's rights to dispute any claim.

## NOTICE

73.     The Oversight Board will provide notice of this Application to: (i) counsel to AAFAF; (ii); counsel to each of the Monolines; (iii) the Office of the United States Trustee for the District of Puerto Rico; and (iv) the indenture trustee for the bonds issues by PRIFA. The Oversight Board submits that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

## CONCLUSION

WHEREFORE, upon submission of the requisite documentation and certifications, the Oversight Board, as Administrative Supervisor, respectfully requests that the Court approve the Qualifying Modification as satisfying all of the applicable requirements of PROMESA Section 601 by entering an order approving the Qualifying Modification and granting such other and further relief as is just and proper.

Dated: October 8, 2021
          San Juan, Puerto Rico

Respectfully submitted,

*/s/ Brian S. Rosen*
Brian S. Rosen
Steve Y. Ma
Matthew A. Skrzynski
Libbie B. Osaben
(*pro hac vice* pending)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as Administrative Supervisor for PRIFA*

*/s/ Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as Administrative Supervisor for PRIFA*

## Exhibit A

**PRIFA Qualifying Modification**